UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
Len C. Pacitti,                                    :
                                                   :
                    Plaintiff,                     :         **MEMORANDUM AND ORDER**
                                                   :         04-CV-3197 (DLI) (MDG)
            -against-                              :
                                                   :
Delta Air Lines, Inc., Argenbright Security, Inc., :
                                                   :
                    Defendants.                    :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Len C. Pacitti filed this suit on July 14, 2004 in New York Supreme Court, Queens County, against defendants Delta Air Lines, Inc. ("Delta") and Argenbright Security, Inc. ("Argenbright") to recover five million dollars in damages for an injury he sustained at John F. Kennedy International Airport ("JFK") in Queens, New York on July 18, 2001 just prior to boarding a flight to Paris, France. The case was removed to this court on July 26, 2004 pursuant to 28 U.S.C. §§ 1441 and 1332. Delta and Argenbright now move to dismiss the complaint on the grounds that it is untimely under the treaty popularly known as the Warsaw Convention,[1] and Delta moves for summary judgment asserting cross-claims against Argenbright for defense and indemnification. For the reasons set forth below, the court denies defendants' dismissal motions because plaintiff was not injured "in the course of any of the operations of embarking or disembarking" an international flight within the meaning of the Warsaw Convention, and therefore his complaint is not subject to the Convention's two-year limitations period. The court further finds that, pursuant to the contract between the parties, Argenbright must defend

---

[1] Convention for the Unification of Certain Rules relating to International Transportation by Air, concluded at Warsaw, Poland, Oct. 12, 1929, art. 1, 49 Stat. 3000, 3014, 137 L.N.T.S. 11, 16 (1934), *reprinted in note following* 49 U.S.C. § 40105.

plaintiff's claims, and indemnify and hold harmless Delta for all attorneys' fees, costs, and damages associated with such defense.

**I.  Background**

The following facts are taken from the depositions, interrogatories, affidavits, and exhibits submitted by the parties. Plaintiff purchased a ticket from Delta to fly from Sarasota, Florida to Milan, Italy, with connections in Atlanta and at JFK. After leaving Sarasota on the morning of July 18, 2001, plaintiff was delayed for two hours in Atlanta and arrived at JFK at approximately 6:00 p.m., having already missed his connecting flight to Milan. As plaintiff's plane stopped outside the terminal at JFK and the passengers onboard began to get up and retrieve their luggage, the pilot announced, "I'm not going to make everyone sit down, but I need to pull [the plane] up, so please hold on." (Pacitti Dep. 13.) After the plane pulled forward approximately nine inches, one of the passengers dropped a piece of carry-on luggage on plaintiff's right knee, causing him some minor pain and discomfort. Once inside the terminal, plaintiff spoke with a Delta representative who informed him that although his scheduled flight to Milan had already departed, plaintiff could board a flight to Paris, France, scheduled to depart at 6:45 p.m. from Gate 9, and from Paris, he could continue on to Milan. Due to the discomfort in his knee and the distance between his arrival and departure gates, plaintiff asked to be transported to Gate 9 in a cart. After being told that no carts were then available, plaintiff agreed to be taken to Gate 9 in a wheelchair.

An Argenbright employee, identified by the parties as Lexan Mercurius, appeared at the Delta counter with a wheelchair to take plaintiff to Gate 9. Plaintiff took his seat in the wheelchair and placed his carry-on luggage on his lap, while Ms. Mercurius began pushing the wheelchair towards Gate 9. Other than briefly greeting Ms. Mercurius, plaintiff did not speak

with her while he was seated in the wheelchair. At approximately 6:20 p.m., the pair approached a ramp located between Gates 3 and 4 and approximately ninety to ninety-five yards away from Gate 9. As Ms. Mercurius attempted to push the wheelchair up the ramp, plaintiff was thrown from the wheelchair and onto the floor, landing on all fours and injuring his left knee.

After the fall, plaintiff declined Ms. Mercurius's invitation to return to the wheelchair, instead deciding to walk the rest of the way to his departure gate. He asked Ms. Mercurius to accompany him to the Delta counter at Gate 9 so that they could fill out an incident report. At the counter, plaintiff spoke with Mr. Robb, who filled out an incident report, which indicates that plaintiff "fell out of wheelchair while being pushed up [a] ramp" located on the right side of the terminal between Gate 3 and Gate 4. (Pl. Opp., Ex. E.) Plaintiff then boarded the flight to Paris, and continued without incident to Milan, arriving on July 19, 2001.

According to plaintiff, the whole chain of events from when he arrived at JFK until he boarded the flight to Paris occurred over no more than twenty minutes. Plaintiff's arrival and departure gates were both located in a "sterile terminal area," reserved for ticketed passengers who had already cleared security. It was Delta's policy at the time of the accident to allow its passengers to board their flights until approximately ten minutes prior to departure. The accident occurred within Terminal 3 at JFK, which serviced both domestic and international flights and was used by Delta, as well as by a number of other airlines. At the time of the incident, there was a restaurant on a mezzanine level, accessible by a staircase approximately ten feet away from where the incident occurred. Although other vendors have operated in the area nearby where plaintiff was injured subsequent to 2001, it is unclear whether any were in operation at the time of the incident.

At the time of the incident, Argenbright and Delta were parties to a contract, entitled "Master Agreement for Skycap Services" (the "Skycap Agreement"), wherein Argenbright agreed to "provide wheelchair and other special assistance to Delta's customers, between all gates and ticket counters . . . and connecting flights." (Skycap Agreement 2.) According to Norman Michael Robb, who in 2001 was a passenger service agent for Delta, Delta would contact Argenbright after a passenger requested wheelchair service, and an Argenbright employee would transport the passenger to their desired destination. Section 8 of the Skycap Agreement further provided that:

> To the fullest extent permitted by law, [Argenbright] shall release, indemnify, defend and hold harmless Delta . . . from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever . . . which in any away arise out of or result from any act(s) or omission(s) by [Argenbright] . . . in the performance or nonperformance of services or other obligations under this Agreement . . . including . . . injury to or death of any person . . . . This Section shall apply regardless of whether or not the . . . injury complained of arises out of or relates to the negligence . . . of, or was caused in part by, [Delta]. However, nothing contained in this Section shall be construed as a release or indemnity by [Argenbright] of [Delta] from or against any loss, liability or claim to the extent arising from the gross negligence or willful misconduct of [Delta].

(Skycap Agreement § 8.) Section 7.1 of the Skycap Agreement stated that Argenbright was obligated to carry its own insurance, and to list Delta as an additional insured to the extent required by Argenbright's indemnity obligations.

## II. Discussion

### A. Summary Judgment Standard

Although defendants ostensibly moved to dismiss plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, all parties have filed numerous depositions, affidavits, interrogatories, and exhibits in connection with the pending motions. "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not

4

excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Accordingly, defendants' Rule 12(b) motions are converted into motions for summary judgment under Rule 56.

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

B.  The Warsaw Convention

The success of defendants' dismissal motion depends entirely upon whether plaintiff was injured in the process of "embarking" an international flight, as that term is defined under the

Warsaw Convention. The Warsaw Convention's signatories—including the United States, France, and Italy—entered into the treaty in order to create a uniform system of liability to govern claims arising from international air transportation, and also to balance the right of passengers to recover damages for injuries sustained aboard international flights with the interests of air carriers seeking to limit their potential liability. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169-71 (1999) (citations omitted); *see* 49 Stat. 3000. To achieve this balance, the Convention makes air carriers strictly liable for the injuries of passengers on international flights[2] while at the same time limiting the type of injuries that are compensable under the Convention and the length of time that a passenger may wait before seeking relief for such injuries.

Specifically, Article 17 provides that a carrier's personal injury liability extends only to damages "sustained in the event of . . . bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Article 29 provides that the right to recover damages under the Convention "shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination." If the Convention applies to a passenger's claim, its terms provide the passenger's sole avenue of recovery. *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 457 (2d Cir. 2003) (citing *Tseng*, 525 U.S. at 160-61). As such, plaintiff has no right to relief if the court determines that his claim falls within the parameters of the Warsaw Convention, because plaintiff did not file his complaint until almost three years after his arrival in Milan. The parties do not dispute that plaintiff's injury resulted from an "accident" within the meaning of the Convention, *see Air France v. Saks*, 470 U.S. 392,

---

[2] As modified by the Montreal Protocols, Agreement CAB 18900 (1966), the liability of air carriers under the Warsaw Convention is capped at $75,000 and does not extend to cases in which the passenger's own negligence was the cause of his or her injury.

6

405 (U.S 1985) (defining "accident" as "an unexpected or unusual event or happening that is external to the passenger"), thus, the court must determine whether this accident "took place . . . in the course of any of the operations of embarking or disembarking."

The present language of Article 17 represents a compromise between proposed language that would have held carriers responsible for all injuries suffered by international passengers "from the time when (they) enter the airport of departure until the time when they exit from the airport of arrival," and language that would have limited carriers' liability to only those accidents that occurred while the passengers were actually onboard the plane. *Alleyn v. Port Authority of New York*, 58 F. Supp. 2d 15, 19 (E.D.N.Y. 1999) (citing *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 35 (2d Cir. 1975)). Although somewhat ambiguous, the "course of any operations of embarking or disembarking" language has allowed courts to apply a flexible fact-specific approach to resolving cases under Article 17. *See Day*, 528 F.2d at 33 (adopting a test "based on activity (what the plaintiffs were doing), control (at whose direction) and location"). Under this approach, as it has been refined in this circuit, courts generally consider four interrelated factors: "(1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movements; (3) the imminence of actual boarding; (4) the physical proximity of the passengers to the gate." *See King v. American Airlines, Inc.*, 284 F.3d 352, 359 (2d Cir. 2002) (quoting *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2d Cir. 1990)). With these factors in mind, the court now considers plaintiff's claim to determine whether it is subject to the Warsaw Convention.

When plaintiff fell from his wheelchair, he was passing through JFK's Terminal 3 on the way to his departure gate. Terminal 3 is an area used by multiple airlines for both domestic and international flights, and is reserved for ticketed passengers who have checked their baggage and

cleared security. At the time of plaintiff's accident, Terminal 3 contained at least one restaurant. Generally speaking, courts within this circuit and elsewhere have declined to hold that a passenger who is injured in the common area of a terminal is subject to the Warsaw Convention, *see*, *e.g.*, *Rabinowitz v. Scandinavian Airlines*, 741 F. Supp. 441, 446 (S.D.N.Y. 1990) (observing that "[t]he courts have consistently refused to extend coverage of the Warsaw Convention to injuries incurred within the terminal, except in those cases in which plaintiffs were clearly under the direction of the airlines.") (quoting *Knoll v. Trans World Airlines, Inc.,* 610 F. Supp. 844, 846 (D. Colo. 1985)), unless the passenger is "actively engaged in preparations to board the plane," *see Buonocore*, 900 F.2d at 10.

In *Day v. Trans World Airlines*, *Inc*. the Second Circuit found that the Warsaw Convention applied to claims brought on behalf of passengers who were killed or injured in a terrorist attack at an airport in Greece. 538 F.3d 31. At the time of the attack, the passengers had been directed by airline employees to stand in line at the departure gate for the purpose of undergoing a weapons search, and "had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights." *Id*. at 33. The court found that passengers' activity at the time of the attack weighed in favor of applying the Warsaw Convention because "[t]he passengers were not free agents roaming at will through the terminal," but instead were engaged in an activity that was imposed by the airline as a condition of embarkation. *Id*. In contrast, the Second Circuit declined to apply the Convention in *Buonocore v. Trans World Airlines, Inc.* to the claim of a passenger killed in a terrorist attack at an Italian airport because that passenger "had only checked in at the ticket counter[,] was in the public area near a snack counter," and was free to roam about the terminal until his flight was called. 900 F.2d at 10-11.

8

In the instant case, the court finds that plaintiff's activity is more akin to that of the plaintiff in *Buonocore* than that of the plaintiffs in *Day*. Plaintiff was in a common area of the terminal used by various airlines for both domestic and international flights, and was not engaged in an activity that was imposed by Delta as a condition of embarkation. *See, e.g.*, *Rabinowitz*, 741 F. Supp. at 446 (declining to apply Warsaw Convention to passengers who were injured during layover because although they were confined to the terminal building, "[t]hey were free to go to a restroom, restaurant, bar or refreshment counter, to shop in the arcade, or to visit with other international passengers in the waiting lounges."); *cf. Barratt v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, No. 88-CV-3945, 1990 WL 127590 (E.D.N.Y. Aug. 28, 1980) (passenger injured in the course of embarking because "[s]he had been 'herded in line' with her fellow passengers[,] . . . clearly 'risked missing her flight if [she] strayed.' . . . [and because] it was the airline, not plaintiff, who chose and controlled the route by which she would get from the departure area to the aircraft").

Defendants, however, strongly urge the court to find that plaintiff was not acting as a free agent at the time of his accident because he was in a wheelchair being pushed by an agent of Delta, and thus, was under the airline's control. A Massachusetts district court persuasively addressed and rejected this exact argument in *Dick v. American Airlines, Inc.* when it noted that:

> [P]roviding a passenger with courtesy wheelchair transport through the airport from one gate to another is not the kind of control that the cases seem to have in mind. . . . Providing a courtesy transport through the airport is quite different from organizing a group of passengers so that all might pass in an orderly fashion through security clearance or the actual boarding gate. . . . [T]he wheelchair attendant was not directing the plaintiff or her mother to the escalator as part of the airline's boarding procedures and protocol, but rather was assisting the plaintiff and her mother to get where they wanted to go.

476 F. Supp. 2d 61, 64 (D. Mass. 2007) (citing *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 156 (3d Cir. 1977); *Martinez Hernandez v. Air France*, 545 F.2d 279, 283 n.5 (1st Cir.

1976); *Day*, 528 F.2d at 33). This court agrees with the *Dick* court that a passenger who requests to be transported in a wheelchair is not, by virtue of such request, submitting to the airline's control. Moreover, plaintiff's actions immediately following the accident belie the notion that he was under Delta's or Argenbright's control. After falling out of the wheelchair, plaintiff decided to walk to Gate 9 under his own power, and he directed Ms. Mercurius to accompany him in order to fill out an incident report. These facts demonstrate that rather than controlling plaintiff's actions, Ms. Mercurius was acting at plaintiff's behest. Accordingly, the court finds that plaintiff's activity at the time of the accident, and the lack of restrictions placed by Delta on that activity, weigh against applying the Warsaw Convention to plaintiff's claim.

The court also finds that the distance between plaintiff and the departure gate at the time of the accident weighs against finding that plaintiff was injured in the course of embarking. Plaintiff's accident occurred between Gates 3 and 4, approximately ninety to ninety-five yards away from Gate 9. In embarkation cases, courts generally have applied the Warsaw Convention only where the plaintiff had already passed through the departure gate, *see, e.g.*, *Baratt*, 1990 WL 127590 at *3 (passenger was standing in line at the departure gate), *see, e.g.*, *Day*, 528 F.2d at 33 (passenger was in an area immediately adjacent to the departure gate), *see, e.g.*, *Rajcooar v. Air India Ltd.*, 89 F. Supp. 2d 324, 325 (E.D.N.Y. 2000).

The only factor that does weigh in favor of applying the Convention to plaintiff's claim is the imminent departure of plaintiff's flight to Paris. Plaintiff's accident occurred at approximately 6:20 p.m., his flight was scheduled to depart at 6:45 p.m., and passengers had already begun to board the plane. It was Delta's policy to finish boarding all passengers approximately ten minutes before a plane is scheduled to depart. Thus, at the time of the accident, plaintiff had only fifteen minutes in which he could board his flight, and at least to a

certain degree, he "was not free to engage in any pursuits of his own choosing except at risk of missing his plane." *See Rajcooar*, 89 F. Supp. 2d at 328. Defendants rely heavily on *Rajcooar v. Air India Ltd.*, a case in which the Hon. Allyn Ross applied the Warsaw Convention to a plaintiff who suffered a heart attack while approaching a line of passengers waiting at the departure gate of an imminently departing flight. In her opinion, Judge Ross noted that "[a]lthough [the plaintiff] was not acting under the explicit control of the defendant, he risked missing his plane if he strayed far from the gate." 89 F. Supp. 2d at 327. Although Mr. Pacitti faced similar time constraints, the court is convinced that a different result from that reached in *Rajcooar* is warranted.

In *Rajcooar*, Judge Ross emphasized that the injury occurred in close proximity to the departure gate, and in an area of the airport restricted to international passengers. *See id.* at 327 ("[T]he incident occurred immediately outside the gate . . . [and] [a]lthough the location was not controlled exclusively by the airline . . . , it was a part of the airport accessible only to passengers on international flights, as in *Day*."). By contrast, when plaintiff fell from the wheelchair, he was still almost one hundred yards, and several gates, away from Gate 9, and he was in a common area of the airport accessible to domestic and international passengers alike. Under these circumstances, the court is convinced that plaintiff's accident did not occur "in the course of any of the operations of embarking or disembarking," and that his claim is therefore not subject to the Warsaw Convention's two-year statute of limitations. Accordingly, defendants' motions for summary judgment on this issue are denied.

    C.    <u>Argenbright's Liability under the Skycap Agreement</u>

Delta has also moved for summary judgment against Argenbright, claiming that the Skycap Agreement requires Argenbright to "release, indemnify, defend and hold harmless Delta"

11

from all expense associated with the defense of this action. (*See* Skycap Agreement § 8.) Argenbright responds by arguing that this clause is inapplicable because plaintiff's injury was a cause of Delta's own gross negligence or willful misconduct. According to Argenbright, Delta acted with willful misconduct and/or gross negligence when the pilot on plaintiff's flight from Atlanta to New York moved the plane forward nine inches without first asking the passengers to sit down, causing a passenger to drop a piece of luggage on plaintiff's knee, which in turn, caused plaintiff to require assistance in reaching his departure gate at JFK. Argenbright also claims that Delta acted with willful misconduct or gross negligence when it provided plaintiff with wheelchair transport, instead of transport in a cart as plaintiff had requested. The court finds these arguments entirely unconvincing. Regardless of whether the pilot of plaintiff's flight into JFK was acting with gross negligence or willful misconduct by failing to require the passengers to remain seated, an issue on which the court expresses no opinion, the injuries plaintiff sustained when he fell from the wheelchair inside the terminal were in no way a foreseeable result of such conduct. Moreover, it is unclear how Delta was negligent, much less grossly so, when it offered to provide wheelchair transport to a passenger who expressed a desire not to have to walk to his departure gate. Argenbright has failed to raise a genuine issue of material fact regarding the applicability of the Skycap Agreement's indemnification clause, and accordingly Delta's motion for summary judgment on this issue is granted.

Argenbright further argues that even if the court should hold it liable for defense and indemnification, the court should limit its liability to Delta's out-of-pocket expenses because Delta is covered under its own insurance policy, and its coverage limits are in excess of plaintiff's demands. Argenbright is correct that New York law limits liability to out-of-pocket expenses where one party has breached its obligation to obtain insurance for a second party, but

the second party is insured under its own policy. *See, e.g.*, *Inchaustegui v. 666 5th Avenue Ltd. P'ship*, 96 N.Y.2d 111, 114 (2001). What Argenbright overlooks, however, is that Delta is not seeking to hold Argenbright liable for breaching its agreement to obtain insurance for Delta, but rather, Delta is seeking to have Argenbright perform its duties under the indemnification clause itself. *See American Ref-Fuel Co. of Hempstead v. Resource Recycling, Inc.*, 307 A.D.2d 939, 941 (2d Dep't 2003) (refusing to apply *Inchaustegui* to situation where a defendant "was seeking to recover legal expenses pursuant to the indemnification provision of the subcontract, rather than damages for breach of an agreement to procure insurance."). As such, Argenbright is bound by the terms of the Skycap Agreement, and must therefore, "release, indemnify, defend and hold harmless Delta" from all liability, costs, and attorneys' fees associated with defending this action.

## III. Conclusion

For the foregoing reasons, the court finds that plaintiff's claim is not governed by the Warsaw Convention, and thus is not subject to the Convention's two-year limitations period. Defendants' summary judgment motions on that issue are denied. Additionally, Delta's motion for summary judgment is granted on the issue of Argenbright's liability under the Skycap Agreement.

SO ORDERED.

DATED: Brooklyn, New York
March 31, 2008

_____/s/_____
DORA L. IRIZARRY
United States District Judge